IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN MOE HUMPHREYS, | No. C 04-03808 SI |
| Plaintiff, | **ORDER RE: MOTIONS TO EXCLUDE EXPERT WITNESSES** |
| v. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., | |
| Defendants. / | |

On April 28, 2006, the Court heard argument on defendants' motion to exclude plaintiff's expert witnesses and on plaintiff's motion to exclude defendants' rebuttal expert witnesses. Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS IN PART both motions.

**BACKGROUND**

Plaintiff Karen Moe Humphreys was terminated from her position in the University of California, Berkeley, Athletic Department in early 2004. She filed this suit later that year, claiming that her termination was the product of illegal gender discrimination, and that it was also in retaliation for her having engaged in protected activities. At the end of discovery, plaintiff produced a number of reports from experts that she intends to call at trial to testify on various topics. Defendants responded with three experts intended to rebut the testimony of plaintiff's experts. The parties have now filed cross motions to exclude the opposing party's expert witnesses from trial.

**LEGAL STANDARD**

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Id.* at 1063. "As the Supreme Court emphasized, however, '[t]he inquiry envisioned by Rule 702 is . . . a flexible one,' . . . and must be 'tied to the facts of a particular case.'" *Id.* (citing *Daubert*, 509 U.S. at 594, and *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999)).

**DISCUSSION**

As mentioned above, the parties have filed cross motions to exclude the opposing party's expert witnesses. Although the Court finds that some of the proposed expert witnesses are qualified to testify, the Court's ruling should not be interpreted as a sign that the witness may testify to all of his or her conclusions at trial. Rather, the ruling means simply that the expert meets the threshold requirement that he or she is qualified and that some facets of the testimony will be helpful to the jury.

**1.   Defendants' Motion**

Defendant seeks to exclude five of plaintiff's expert witnesses from trial: Dr. Jay M. Finkelman; Anthony R. Pierno, Esq.; Donna de Varona; Donna A. Lopiano; and Dr. Robert R. Trout.

**A.   Dr. Finkelman**

Finkelman is "Interim Systemwide Dean in charge of the California School of Business and Organizational Studies and Program Director and Full Professor of the Organizational Studies Division

2

of CSBOS at Alliant International University." Velez Decl., Exh. A at 1. His expert report covers best human resources management practices, and concludes that the University's treatment of plaintiff was inconsistent with a number of those practices. For example, Finkelman states that downsizing "is usually viewed as an opportunity to retain the strongest workers," and notes that plaintiff was laid off despite her long and "outstanding career as an athlete, coach, and administrator." *Id.* at 10. Similarly, Finkelman discusses business organizations' obligations "to ameliorate the impact [of downsizing] by offering a viable and alternative position," if one is available. *Id.* at 11. He contrasts this obligation with the University's decision to fill a compliance position a month before plaintiff was notified that she was being laid off, rather than keep it available for plaintiff. Other topics covered by Finkelman include the inadequacy of a marketing position plaintiff was offered in lieu of being laid off, and the lack of involvement by senior human resources administrators in the layoff process.

The Court agrees with plaintiff that Finkelman's proposed testimony about the University's deviation from good human resources practices is proper expert testimony under Rule 702. The University's failure to follow such practices is relevant to plaintiff's contention that the layoff was a pretext for gender discrimination or retaliation, and Finkelman's testimony will assist the jury because the average juror is unlikely to be familiar with human resources management policies and practices. The Court, however, agrees with defendants that Finkelman may not testify that the University's failure to comply with good human resources practices is indicative of discrimination. While the jury may ultimately accept such an inference, Finkelman's testimony to that effect is unlikely to assist the jury and runs the risk that the jury will pay unwarranted deference to Finkelman's expertise. *Cf. Kotla v. Regents of the Univ. of Cal.*, 115 Cal. App. 4th 283, 291-93 (Cal. App. 2004) (collecting federal cases and concluding that testimony that "certain facts in evidence were 'indicators' of retaliation" was inadmissible).

As to reliability, defendants argue that Finkelman does not meet the *Daubert* criteria for reliability. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593-94 (1993). The criteria from *Daubert* that defendants cite, however, concerned "scientific" knowledge. *See id.* at 590 n.8 ("Our discussion is limited to the scientific context because that is the nature of the expertise offered here."). When expert testimony is offered for "specialized "knowledge," courts have long recognized that

reliability may come from experience in the field. *See, e.g.*, *Hangarter v. Provident Life and Acc. Inc. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004); *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269-70 (9th Cir. 1996).

Here, Finkelman is a Professor of Organizational Studies who teaches the "advanced elective doctoral level course . . . focusing on the human resource management issues in employment and discrimination litigation, as well as the doctoral level course in Human Resource Management." Velez Decl., Exh. A at 1. He holds a Ph.D. in Industrial/Organizational Psychology from New York University, and is a member of numerous professional organizations. *Id.* at 2. Further, he worked for 13 years in the staffing and employment industry, and was founding partner of a consulting firm for staffing issues. *Id.* As his list of qualifications indicates, Finkelman has testified and published extensively on human resources issues. *See id.* at 3-9. The Court agrees with plaintiff that Finkelman's experience, training, and education render his conclusions sufficiently reliable to satisfy the *Daubert* standard.

**B.     Anthony R. Pierno, Esq.**

Pierno is an attorney who formerly served as Senior Vice President of MAXXAM, Inc., and its subsidiary corporations. Velez Decl., Exh. B. He was formerly a partner at the Los Angeles office of Pillsbury, Madison & Sutro, and also served as Commissioner of Corporations in California under Governor Ronald Reagan. *Id.* Plaintiff offers Pierno to give his opinion about two areas: a discussion of the purported financial bases for plaintiff's layoff, specifically including the University's decision to execute "sweetheart" severance agreements with members of the Athletic Department's Executive Team; and a discussion of improprieties surrounding the University's use of Korn/Ferry, an executive search firm, to hire senior administrative members of the athletic department.

The Court agrees with defendants that Pierno may not testify regarding the Korn/Ferry search, for a number of reasons. First, while Pierno has demonstrated that he may have sufficient familiarity with severance agreements to satisfy Rule 702's reliability requirements, he has not demonstrated that he has such familiarity with the procedures used by executive search firms. Pierno's experience is limited to "having been recruited twice to new positions by such firms . . . [and] having hired such firms

4

1 to conduct searches on numerous occasions." *Id.* at 5. Although Pierno argues that he "thoroughly
2 explored their methods with them" during these processes, he never actually worked for such a firm.
3 The Court finds that Pierno's limited experience does not meet the "reliability" standard for expert
4 testimony.

5 Federal Rule of Evidence 403 provides a further reason for excluding Pierno's testimony
6 regarding the executive search process. The Korn/Ferry search, while central to plaintiff's original
7 complaint, is of extremely marginal relevance to the allegations in the fourth amended complaint. The
8 fourth amended complaint refers to the search in a single paragraph, and nowhere mentions Korn/Ferry
9 by name. Allowing expert testimony on a subject of such limited relevance would create a strong risk
10 of confusion of the issues, misleading the jury, and waste of time. *See* Fed. R. Evid. 403.

11 The Court, however, finds that Pierno may testify to a limited degree regarding the "sweetheart
12 deals" that the University allegedly signed with senior administrators in the Athletic Department both
13 before and after Humphreys left.[1] Pierno's history as outside counsel to corporate clients, as a board
14 member of educational institutions, and as a senior corporate officer provide him with sufficient
15 familiarity with executive severance agreements to testify reliably in this case. Further, his proposed
16 testimony that the "sweetheart deals" are unusually generous is relevant to plaintiff's contention that
17 budgetary savings were a pretext for her layoff. Pierno's testimony will also likely be helpful to the
18 jury, which will likely be unfamiliar with the contents of severance agreements. Accordingly, the Court
19 finds that Pierno's may testify on the limited subject above.

---

[1] Although Pierno's report purportedly covers this topic, the bulk of the report consists of a summary of the facts supporting plaintiff's theory of the case. This summary contains a number of fairly biased comments, such as: "[s]ome people might call [the timing of plaintiff's layoff] coincidence – such people also believe the Holocaust never occurred"; "Taking steps to solve any institution's budgetary problems is critically important. It is never so important as to justify gender discrimination . . . ."; "The issue is not whether he was overly generous to the three males mentioned, but whether his generosity toward the males is to be compared to the penuriousness toward Ms. Humphreys in determining whether there was gender discrimination."; "In terminating Ms. Humphrey . . . the University discriminated against her in comparison to how it had treated others of lesser import in the broader community in which the University must function."; and "In limiting her termination compensation to the minimums for which she would otherwise have qualified . . . the University discriminated against Ms. Humphreys." *Id.* at 3-5. Plainly, Pierno may not testify to these conclusions at trial.

*United States District Court*
For the Northern District of California

### C.     Donna de Varona

De Varona, a television and radio sportscaster for the past forty years, has been intricately involved with the development of women's sports in this country, including "working with Congress to help shape Title IX," serving as a member of President Ford's Commission on Olympic Sports Commission, and most recently serving on President Bush's Commission on Opportunity in Athletics. Plaintiff offers de Varona to "testify to the dearth of female administrators, advocates, mentors and role models in intercollegiate athletics" and to rebut defendants' claim that plaintiff's position "could be eliminated without severe disruption to the Athletic Department." Pl. Oppo Br. at 8.

The Court agrees with defendants that de Varona's proposed testimony is not proper expert testimony under Rule 702. The majority of de Varona's report consists of repeated praise of plaintiff and her accomplishments. While likely well-deserved, such testimony does not reflect "specialized knowledge," nor is it likely to be helpful to the jury, given that plaintiff will be available to testify. Further, testimony regarding the lack of women in university athletic departments and the impact of plaintiff's departure on female student athletes at UC Berkeley raises a substantial possibility of confusion of the issues and misleading the jury. *See* Fed. R. Evid. 403.

### D.     Donna A. Lopiano

Lopiano is Chief Executive Officer of the Women's Sports Foundation, a national non-profit organization that seeks to educate the public about gender issues in athletics. Velez Decl., Exh. D at 1. Lopiano's report offers her opinion about the University's treatment of plaintiff, plaintiff's value to the University, the "culture of discrimination" in the UC Berkeley Athletic Department, and about plaintiff's future in intercollegiate athletics.

The Court agrees with defendants that many of Lopiano's conclusions should be excluded from trial. For example, much of Lopiano's expert report consists of little more than a recitation of plaintiff's evidence, combined with her conclusion that the evidence demonstrates that plaintiff was discriminated against. Allowing this form of testimony would greatly infringe upon the role of the jury. Similarly, Lopiano's conclusion that there was a "general culture of gender discrimination and hostility towards women" in the UC Berkeley Athletic Department is based on a recitation of evidence that Lopiano did

6

not observe. *Id.* at 11. Once again, however, her conclusions are not based upon any specialized knowledge; the jury can consider the same evidence she has considered and is certainly qualified to make conclusions based upon that evidence.

Although Lopiano's conclusions may be unhelpful to the jury, plaintiff also offers her as a general resource on Title IX and NCAA. The Court believes this testimony may be helpful to the jury, as the average juror in unlikely to be familiar with the contours of Title IX or the intricate regulatory scheme created by the NCAA rules. Further, the Court finds that Lopiano's extensive experience is more than sufficient to qualify her as an expert on these topics. Indeed, Lopiano has testified in front of congressional committees many times, and heads a non-profit organization dedicated to educating the public about gender issues in athletics. Her education and qualifications easily satisfy the threshold reliability requirement.

Accordingly, the Court DENIES defendants' motion as to Lopiano.

### E.     Dr. Robert R. Trout

Finally, plaintiff proffers Trout as an expert on the economic damages she has suffered. Defendants' sole objection to Trout's report is that he failed to take into account plaintiff's duty to mitigate her damages. Defendant has not cited a single case holding that such a reason is sufficient to exclude an expert. The Court agrees with plaintiff that defendants' argument goes to the weight of Trout's conclusions, not their admissibility. Indeed, defendants have proffered their own rebuttal expert to point out the fact that Trout did not consider plaintiff's duty to mitigate. Accordingly, defendants' motion is DENIED as to Trout.

## 2.     Plaintiff's Motion

Plaintiff moves to exclude defendants' three rebuttal experts from trial: John G. Harlow; Craig Pratt; and George Fruehan.

### A.     John G. Harlow

Defendant offers Harlow's testimony to rebut the proposed testimony of plaintiff's expert

Anthony R. Pierno. As discussed above, Pierno's expert report concludes that there were numerous improprieties in an executive search process employed by UC Berkeley to fill executive level positions in its Athletic Department shortly before Humphreys was terminated. Harlow's rebuttal report describes the search process and concludes that no improprieties occurred. Sinclair Decl., Exh. 2.

As discussed above, the Court believes that Pierno's testimony should be excluded from trial to the extent it covered the Athletic Department's executive search. The search is of extremely marginal relevance to this case, and expert testimony about the search raises a substantial risk of confusion of the issues and misleading the jury. As the Court has held that Pierno may not testify concerning the executive search process, the Court finds that Harlow's rebuttal testimony is unnecessary. Accordingly, the Court GRANTS plaintiff's motion as to Harlow.

### B.   Craig Pratt

Defendants offer Craig Pratt as a rebuttal witness to Dr. Jay Finkelman, plaintiff's expert on human resources policies and procedures. Pratt's report, however, is only 3 paragraphs long, and the entirety of his opinion reads as follows: "I read the report of Plaintiff's expert, Dr. Jay Finkelman and, based on my understanding of the discovery record, I disagree with many of his conclusions. I believe Dr. Finkelman has made a faulty analysis and/or otherwise improperly applied principles in my field attendant to the prevention of discrimination and/or retaliation in the context of an organizational 'reduction-in-force.'" Sinclair Decl., Exh. 3. Pratt's report also states that he expects "to review additional discovery materials, including but not limited to the material Dr. Finkelman reviewed prior to his report." *Id.*

Pratt's report fails to comply with the basic requirements of the Federal Rules of Civil Procedure, which require "a complete statement of all opinions to be expressed and the basis and reasons therefore." Fed. R. Civ. P. 26(a)(2)(B). Without more information, plaintiff is prevented from understanding the reasons behind Pratt's opinion, and the Court certainly is unable to determine whether Pratt's report meets the threshold "reliability" requirement for expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Further, it appears that Pratt reached his conclusion after reviewing only Finkelman's report, which is the sole document that Pratt's report specifically states that

he reviewed. Sinclair Decl., Exh. 3. This further suggests that Pratt's opinion is unreliable.

Defendants have failed to comply with the most basic requirements of expert disclosure under Federal Rule 26. Accordingly, the Court GRANTS plaintiff's motion as to Pratt.

### C.     George R. Fruehan

Defendants offer Fruehan as a damages expert to rebut the testimony of Dr. Robert R. Trout, plaintiff's expert on damages. Fruehan's report concludes that Trout did not consider plaintiff's duty to mitigate damages. Sinclair Decl., Exh. 4. It also concludes that Trout inappropriately assumed an average pay increase of 3.1% per year, arguing instead that plaintiff's salary would have hit the maximum salary within her "salary band" at some point. *Id.*

Plaintiff raises two concerns with Fruehan's report. First, she contends that Fruehan's report indicates that he found multiple problems with Trout's method of computation, yet only discloses the "salary band" problem. *See* Sinclair Decl., Exh. 4 ("There are also problems with the method of computation."). The Court agrees with plaintiff that Fruehan may not testify at trial regarding matters outside the scope of his report.

Second, plaintiff contends that Fruehan's report improperly includes a discussion of plaintiff's duty to mitigate damages. Plaintiff contends that plaintiff's duty to mitigate is not properly rebuttal testimony because Trout made no opinion on plaintiff's duty to mitigate damages. The Court disagrees. Fruehan's report exposes a potential flaw in Trout's method of determining the amount of damages. Accordingly, it is properly classified as rebuttal testimony. Plaintiff is also concerned that Fruehan will testify that plaintiff had a legal duty to accept a specific marketing position in the Athletic Department that the University offered her in lieu of being laid off. The Court agrees with plaintiff that, while plaintiff may have had a legal duty to mitigate, Fruehan may not testify that she had an obligation to accept the marketing position.

///
///
///

9

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' motion (Docket No. 238) and GRANTS IN PART plaintiff's motion (Docket No. 184).

**IT IS SO ORDERED.**

Dated: July 6, 2006

SUSAN ILLSTON
United States District Judge